SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Andreas M. Erazo** (A-16-22) (086991)

**Argued March 13, 2023 -- Decided June 21, 2023**

**SOLOMON, J., writing for a unanimous Court.**

In this appeal, the Court considers whether the Appellate Division properly reversed defendant Andreas Erazo's conviction following his plea of guilty to the rape and murder of A.S. The Appellate Division found that defendant's confession, obtained during a second interview, five hours after his initial 90-minute interview, was not knowing, intelligent and voluntary, and should have been suppressed.

One night in July 2017, eleven-year-old A.S. disappeared. Her mother called the Keansburg Police Department to report her missing. Responding officers knocked at defendant's door, near where A.S.'s brother had seen her earlier. Defendant denied having seen A.S. that evening and allowed the officers to enter his apartment to look for her, but they found nothing suspicious. Police returned early the next morning to conduct a second search but again found nothing. About five and a half hours later, police discovered A.S.'s body on the roof of a shed behind the apartment building, below a window of defendant's apartment.

Police asked defendant to ride with them to the Keansburg Police station to provide a witness statement. At the time, because of damage from Hurricane Sandy, the Keansburg Police were temporarily housed in a two-story, converted church. At the station, defendant sat unrestrained along with others -- including the victim's family -- in a makeshift lobby separated from the rest of the station by a barrier. To go beyond the barrier, civilians needed to be escorted by an officer or employee.

Two detectives met defendant in the lobby and explained that they wanted to talk to him but needed to find a place to do so. About twenty minutes later, the detectives escorted defendant to the only available interview room, which was located on the second floor and was not equipped with audio or video recording equipment. Defendant stated that he knew there was a missing persons investigation and agreed to provide any information he had that could help. The detectives testified that they believed they were taking a witness statement and thus did not administer <u>Miranda</u> warnings or record the interview.

1

After a 90-minute interview during which defendant explained what he knew of and when he had last seen A.S., as well as his activities that day, the detectives asked if defendant needed food, water, or a bathroom break. He asked only to smoke a cigarette. The detectives left defendant alone, unrestrained, in the interview room without locking the door. After leaving the interview room, the detectives were told that a neighbor saw someone matching A.S.'s description enter apartment 16A with someone matching defendant's description on the day A.S. disappeared.

The detectives now considered defendant to be a suspect and sought to move him to the first-floor interview room, which had audio and video recording capabilities, to question him about the neighbor's statements. Defendant was given food and water, and another two cigarette breaks outside. At no time between the interview on the second floor and the recorded interview on the first floor did officers restrain defendant or discuss the investigation.

The detectives conferred with other investigators and collected information while defendant waited unrestrained in the unlocked first-floor interview room. About five hours after defendant's interview on the second floor ended, the detectives started to interrogate defendant about the investigation.

Detective Wayne Raynor stated that they would continue on with their conversation "[b]ut before we do that, because we're in the police department, okay, you're not under arrest, but because we're in a police department . . . . Because we want to talk to you about this[,] I'm going to advise you of your Miranda rights." Raynor then read the Miranda warnings, after which defendant verbally acknowledged his understanding. Defendant reviewed his answers to the Miranda warnings and initialed next to each statement on the Miranda form. Raynor read the waiver clause: "'Having these rights in mind I wish to waive or give up these rights and make a knowing and voluntary statement and answer questions.' That means you're okay with talking to us." Defendant replied, "Yes." Defendant and the detectives then signed and dated the form.

After some questioning, the detectives pointed out several inconsistencies between defendant's unrecorded statement and his current Mirandized, recorded statement. As the interview proceeded, defendant continued to offer theories to explain the evidence against him. Ultimately, after further questioning and a cigarette break in the interview room, defendant stated that he would rather talk to the detectives off-camera, explaining that he would prefer that his mother and girlfriend not see or hear the interview. Defendant then confessed. When the detectives asked defendant for a DNA sample, he responded that he would like to talk to his lawyer. The detectives stopped all questioning at that point and arrested defendant, who was later indicted on seven counts.

2

Defendant moved to suppress the statements he made to the detectives in the first and second interviews. After hearing Raynor's testimony and watching the recording of the second interview, the trial court denied defendant's motion. The trial court found that defendant was not in custody at the time of the first interview and that Miranda warnings were therefore not required. Notwithstanding its conclusion that the first interview was noncustodial, the trial court analyzed whether the second, Mirandized interview should be suppressed under State v. O'Neill, 193 N.J. 148 (2007), which applies only in the context of a two-step interrogation in which officers (1) violate Miranda, warranting suppression, and (2) then seek to redeem themselves by offering the warnings later. The trial court also found, based on Raynor's credible testimony and the video of the second interview, that the State proved beyond a reasonable doubt that defendant's Miranda waiver was knowing, intelligent, and voluntary, and that his confession should be admitted at trial.

Defendant pled guilty to murder and aggravated sexual assault of a victim under the age of thirteen. He then appealed, arguing that his motion to suppress should have been granted. The Appellate Division reversed the trial court's decision, finding that defendant's statements from both interviews should have been suppressed. The Court granted certification. 252 N.J. 154 (2022).

**HELD:** Defendant voluntarily went to the police station to give a witness statement. At the police station, defendant was interviewed twice. During his first interview, defendant was not in custody and thus not yet owed Miranda warnings. The factors set forth in O'Neill therefore do not need to be considered to assess the admissibility of the second interview. And before police interviewed defendant the second time, they properly administered Miranda warnings. With his rights in mind, defendant executed a knowing, intelligent, and voluntary waiver. During his second interview, defendant confessed. Neither the Fifth Amendment nor state common law calls for suppression of defendant's statements.

1. The Court first considers whether Miranda warnings were necessary prior to the first interview with defendant, which hinges on whether the trial court correctly found that defendant was not in custody at the time of the first interview. "Custody" for the purposes of Miranda requires a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. (pp. 24-26)

2. In concluding that defendant was not in custody when he was first interviewed by the detectives, the trial court relied on several facts it found after listening to the testimony of Detective Raynor, which the court found to be credible. The Court reviews those findings -- based upon the trial court's first-hand observations and evaluation of Detective Raynor's testimony -- and notes that they are entitled to appellate deference. The Court finds no reason to second-guess those findings because they are not "clearly mistaken." There is no reason to believe that

3

defendant's trip to the station was anything but voluntary and, at the station, defendant's freedom of action was in no way restrained to a degree associated with formal arrest. Finally, nothing about the interview suggests that it was custodial. The interview consisted of defendant providing general biographical information and insisting that he knew nothing about A.S.'s disappearance. It was only <u>after</u> the interview, when they learned of the neighbor's statement that he saw A.S. enter defendant's apartment, that the detectives considered defendant a suspect. There is no basis to upset the trial court's conclusion that the interview was noncustodial. And because defendant was not in custody, he was not owed <u>Miranda</u> warnings and there is no basis to suppress his statements from the first interview. (pp. 26-28)

3. The Court turns to whether defendant's <u>Miranda</u> waiver at the beginning of his second interview was knowing, intelligent, and voluntary under the totality of the circumstances. The State bears the burden of proving beyond a reasonable doubt that a defendant's waiver of his <u>Miranda</u> rights was valid. The Court reviews factors considered in evaluating the totality of the circumstances. (pp. 28-29)

4. Here, between the first and second interviews, defendant was allowed cigarette breaks and to use the restroom. The trial court observed that during that time, although defendant appeared "bored" and "listless," he did not seem "agitated or distressed in any way." At the start of the second interview the detectives read defendant his <u>Miranda</u> rights. The trial court, after having watched the video of the interrogation, found that defendant received and understood his <u>Miranda</u> rights, and the Court agrees. Throughout the second interview, the detectives pressed defendant about inconsistencies with his first statement, but because there was no initial <u>Miranda</u> violation, the second interview was not "tainted" by reference to the first. The Court rejects the argument that police minimized the significance of the <u>Miranda</u> warnings and the consequences of waiving them. Although Detective Raynor was persistent, persuasive, and frequently appealed to defendant's conscience, he did not undermine <u>Miranda</u> in a way that case law forbids. Moreover, the circumstances suggest that defendant understood the consequences of giving a statement -- he acknowledged that he was on camera and that other officers could be watching, and he was concerned only with his mother and girlfriend seeing the interview. Under the totality of the circumstances, defendant's <u>Miranda</u> waiver was valid, and the trial court properly denied his motion to suppress. (pp. 30-35)

**REVERSED and REMANDED to the Appellate Division.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, and FASCIALE join in JUSTICE SOLOMON's opinion. JUDGE SABATINO (temporarily assigned) did not participate.**

4

SUPREME COURT OF NEW JERSEY

A-16 September Term 2022

086991

State of New Jersey,

Plaintiff-Appellant,

v.

Andreas M. Erazo,

Defendant-Respondent.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| March 13, 2023 | June 21, 2023 |

Melinda A. Harrigan, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued the cause for
appellant (Raymond S. Santiago, Monmouth County
Prosecutor, attorney; Melinda A. Harrigan, of counsel
and on the briefs).

Morgan A. Birck, Assistant Deputy Public Defender,
argued the cause for respondent (Joseph E. Krakora,
Public Defender, attorney; Morgan A. Birck, of counsel
and on the briefs).

Alan Silber argued the cause for amicus curiae
Association of Criminal Defense Lawyers of New Jersey
(Pashman Stein Walder Hayden, attorneys; Alan Silber,
of counsel and on the brief, and Katherine Beilin, on the
brief).

Lauren Gottesman (The Innocence Project) of the New York bar, admitted pro hac vice, argued the cause for amicus curiae The Innocence Project (Dechert, attorneys; Lauren Gottesman, of counsel and on the brief, J. Ian Downes, Rose Marie Wong, of the Pennsylvania bar, admitted pro hac vice, Christopher J. Merken, of the Pennsylvania, New York, and District of Columbia bars, admitted pro hac vice, and Lindsay N. Zanello, of the New York bar, admitted pro hac vice, on the brief).

JUSTICE SOLOMON delivered the opinion of the Court.

In this appeal, the Court considers whether the Appellate Division properly reversed defendant Andreas Erazo's conviction following his plea of guilty to the rape and murder of eleven-year-old A.S. The Appellate Division found that defendant's confession, obtained during a second interview, five hours after his initial ninety-minute interview, was not knowing, intelligent and voluntary, such that it should have been suppressed.

We now reverse. Defendant was not in custody at the time of the pre-confession interview, and thus Miranda v. Arizona, 384 U.S. 436 (1966), is not implicated, nor must we consider the factors set forth by this Court in State v. O'Neill, 193 N.J. 148 (2007), to assess the admissibility of defendant's subsequent, Mirandized confession. We also find that the detectives' tactics during the Mirandized interrogation were not coercive, did not minimize the Miranda warnings, and were consistent with our holding in State v. Sims, 250

N.J. 189 (2022). Thus, under the totality of the circumstances, defendant's Miranda waiver was knowing, intelligent, and voluntary, and the trial court properly denied his motion to suppress.

## I.

### A.

The facts derived from the trial court record of defendant's motion to suppress reveal that one night in July 2017, eleven-year-old A.S. disappeared. Earlier that day, A.S.'s older brother saw her playing on the second floor of their complex near apartment 16A. When he later knocked on that door while looking for her, he received no response.

That evening, A.S.'s mother called the Keansburg Police Department to report her daughter missing. Responding officers knocked at 16A. Defendant answered, identified himself, and denied having seen A.S. that evening. Defendant allowed the officers to enter his apartment to look for A.S., but they found nothing suspicious. Police returned to defendant's apartment early the next morning to conduct a second search but again found nothing.

About five and a half hours later, police discovered A.S.'s partially naked body on the roof of a shed behind the apartment building, below a window of defendant's apartment. The child's body was wrapped in a zippered futon cover that appeared to be stained with blood.

Police asked defendant to ride with them to the Keansburg Police station to provide a witness statement. At the time, because of damage from Hurricane Sandy, the Keansburg Police were temporarily housed in a two-story, converted church about three tenths of a mile from defendant's home. When defendant arrived at the station, he sat unrestrained along with others -- including the victim's family -- in a makeshift lobby separated from the rest of the station by a barrier. To go beyond the barrier, civilians needed to be escorted by an officer or employee.

Detective Wayne Raynor of the Monmouth County Prosecutor's Office Major Crimes Unit and Detective Joseph Jankowski of the Keansburg Police Department (the detectives) met defendant in the lobby and explained that they wanted to talk to him but needed to find a place to do so. About twenty minutes later, the detectives escorted defendant to the only available interview room, which was located on the second floor. That room had windows and could seat five people; it was not equipped with audio or video recording equipment. Defendant stated that he knew there was a missing persons investigation and agreed to provide any information he had that could help. The detectives testified that they believed they were taking a witness statement and thus did not administer Miranda warnings or record the interview.

4

Detectives spoke with defendant for about ninety minutes, during which defendant provided biographical information and said that he was familiar with A.S. and her family, although he stated that he did not know her first name until other officers told him. Defendant went on to say that he had only one interaction with A.S. in the past, when she playfully removed his winter hat while he was talking to a mutual friend of A.S.'s brother. Defendant told the detectives that he saw A.S. sitting in front of the apartment building on the day she disappeared. He said that he remembered what she was wearing but stated that he did not interact with her or see her again that day. He also provided a timeline of his whereabouts and activities for that day.

After finishing the interview, the detectives asked if defendant needed food, water, or a bathroom break, but he asked only to smoke a cigarette. The detectives said they would escort defendant outside for a cigarette break but asked him to wait while they looked for a secretary to type out a formal witness statement. The detectives left defendant alone, unrestrained, in the interview room without locking the door. After leaving the interview room, the detectives were told that Vernon Linen, who lived in an apartment across the street from defendant, saw someone matching A.S.'s description enter apartment 16A with someone matching defendant's description on the day A.S. disappeared. Detectives showed Linen a photo of A.S., and he positively

identified her. Detectives showed Linen a photo of defendant the following day, but he was unable to make a positive identification of defendant.

The detectives now considered defendant to be a suspect and sought to move him to the first-floor interview room, which had audio and video recording capabilities, to question him about Linen's statements. Before moving to the other interview room, the detectives accompanied defendant outside for a cigarette break and provided him with a bagel and some water. Defendant asked for another cigarette and a bathroom break after waiting in the first-floor interview room for about forty minutes, and the detectives obliged. At no time between the interview on the second floor and the recorded interview on the first floor did officers restrain defendant or discuss the investigation.

The detectives conferred with other investigators and collected information while defendant waited unrestrained in the unlocked first-floor interview room. During that time, the detectives spoke with "Sammy," who resided with defendant and identified the futon cover that A.S. was found wrapped in as coming from defendant's room. After eating pizza and drinking water provided to him, defendant cleaned up the table, threw away the trash, and fell asleep for a short time. About five hours after defendant's interview

6

on the second floor ended, the detectives started to interrogate defendant about the investigation.

Before reading defendant the <u>Miranda</u> warnings, Detective Raynor stated:

> Listen, we spent a considerable amount of time together, and, you know, you've been very forward with me. You've been very easy to talk to. You and I have spoken to each other today, and it's been a very easy conversation, all right, and I expect that that's where we're going to continue on with this, obviously. But before we do that, because we're in the police department, okay, you're not under arrest, but because we're in a police department, this is a matter obviously we talked about earlier. This is, you know, something that we want to talk to people about. Because we want to talk to you about this[,] I'm going to advise you of your <u>Miranda</u> rights.

Raynor then read the <u>Miranda</u> warnings, after which defendant verbally acknowledged his understanding. Raynor then explained that a decision to waive his rights was not final and could be withdrawn at any time, either before or during questioning, and confirmed that defendant could read and understand English. Defendant reviewed his answers to the <u>Miranda</u> warnings and initialed next to each statement on the <u>Miranda</u> form. Raynor read the waiver clause: "'Having these rights in mind I wish to waive or give up these rights and make a knowing and voluntary statement and answer questions.'

7

That means you're okay with talking to us." Defendant replied, "Yes."

Defendant and the detectives then signed and dated the form.

Raynor started the interview by explaining that he would like to "go over pretty much everything that [they] talked about earlier today," to which defendant responded, "No problem." Raynor asked defendant about his upbringing and other background information, and defendant offered personal details about struggles at home, his use of drugs and alcohol, and mental health issues.[1] Defendant also told the detectives that his friend Sammy had moved into apartment 16A with defendant and his mother.

The detectives ultimately returned to defendant's activities on the day A.S. went missing. As he did earlier, defendant recounted a timeline of what he did that day. The detectives pointed out several inconsistencies between defendant's unrecorded statement and his current Mirandized, recorded statement, explaining:

> Raynor: [T]his -- this sounds completely different than when we spoke earlier, and that's why -- I don't mean to sound like a broken record, going round and round. I can see that you're -- you're changing your -- whether you're over thinking, or --
>
> Defendant: It's just the fact that I'm getting -- like, I've been here for hours. I'm just getting more tired.

---

[1] Other than defendant's remarks, there is no evidence of record regarding defendant's purported mental health issues.

Raynor: Yeah. But, listen -- but -- and I understand that. And that's why -- that's why it's important to talk to me.

Defendant: I know.

The detectives finally asked defendant if he understood why they were all sitting there, to which defendant responded, "The most that I know is that she is missing." Detective Raynor then informed defendant that he had spoken extensively to Sammy earlier while defendant was eating, and continued:

You have to -- you have to recognize and understand that this isn't an arena that -- this isn't an arena that you want to bulls**t around. Okay? Like I said, my job is to sit here and to help you through this. Okay? I know mistakes happen. I know things happen. I know that you're not a monster.

I know that you have had whatever you have had to deal with, but I know that s**t happens. Joe and I have done this job long enough to know that just because of the person sitting here and the things that we have is not a direct reflection. All right? But I have to -- I have to get into a dialogue with you about this because, Dre, it's -- we've got stuff. We've got -- we're talking with Sammy. We actually have somebody who saw. Okay? Somebody who saw her at your house. All right? And I can understand that, and I can understand. And what this is is you go into a self-preservation mode. All right? Your default is to do exactly that. And I get that. And it's nothing personal. And I've seen it a thousand times.

But moving forward into that, Dre, is not -- not something that we can sit here and be stuck on.

9

Detective Raynor clarified that A.S. had been found wrapped in something that was identified as being from defendant's apartment. Raynor also explained that A.S. could be seen around dusk on a surveillance video near the apartment complex, but that defendant was not on the video despite his earlier claim that he was walking back to his apartment around that time. The detectives interpreted that to mean that defendant was at the apartment at the same time as A.S.

As defendant continued to deny letting A.S. into his apartment or having anything to do with the matter, Raynor said the following:

> Everything is coming back to your apartment, and I want to talk to you about that. I'll be happy to -- I'll be happy to tell you what is in and out of your apartment, but I've got to -- I've got to have you come on board with me . . . . I want you to understand the gravity that you're not being judged. You're not being looked at. Things happen.
>
> . . . .
>
> The hardest part right now is for you to understand and to -- to deal with the fact, be able to open your mouth and start talking to me about something that you know is heinous, you know is not good, but you also know that it's a mistake.

Defendant continued to offer other theories to explain the evidence against him, causing Raynor to say:

> Don't let a moment of weakness define you as a person. I know you feel you have a lot on your plate right now.

10

I know you feel like you have a lot to lose. That's understandable. You're 18 years old. You have your entire life ahead of you.

. . . .

Don't let it define you. Don't let it -- don't let us -- don't let this define you. Let's -- tell me about it, Dre. Tell me about -- tell me about when it went bad. When did it come off the rail?

In response, defendant asked to smoke a cigarette, which the detectives permitted inside the interview room. As defendant smoked, he and the detectives had the following exchange:

Raynor: I'm glad that you see that the way Joe and I -- the way we see people, Dre, we see bad things happen to good people. You didn't -- you didn't plan this, did you?

Defendant: Can I ask you something real quick?

Raynor: Sure.

Defendant: Um -- you said that's off, right? Where we're not on camera?

Raynor: What's off?

Defendant: The camera.

Raynor: The camera? It's being recorded.

Defendant: Yeah. I thought so.

Raynor: It's all right.

11

Defendant:  Because I'd rather talk to you two just men to men.

Raynor:  Man to man?

Defendant:  Yes.  No video, no nothing.  And then -- I know obviously I need to say it out loud, but I'd rather talk to you two men to men.

Raynor: I understand that.  Here's -- here's -- I'm going to ask you to listen to me.  This is why -- this is why the dialogue is important.  I -- the only thing that that recording does is show you.  Okay?

Defendant:  So, it's not (indiscernible)?

Raynor:  No. I mean, it's -- no, I don't mean that literally.

Defendant:  Oh.

. . . .

Raynor:  Figuratively what that camera does is show that Joe and I aren't -- it shows you.  It shows you as a human.  It shows you as a person.

Jankowski:  And you want that.  You want -- you want us to -- you want people -- you want us to see that.

Raynor:  That's my point.  It shows you --

Jankowski:   You need to see that.

Defendant:  Basically -- all right.  Why isn't anyone watching it, besides like a police officer?  Like, is, like, my mom watching --

Raynor:  No.

12

Jankowski:  No.

Raynor:  No, no, no, no.

Defendant:  Okay.

Raynor:   Absolutely not.   Nobody knows this is
happening right now.

Defendant:  So, I mean, if it's another police officer,
whatever, I'd just rather, one, my mother and my
girlfriend, obviously, don't see it, hear it, whatever.

Raynor:  Uh-huh.

Defendant then explained that the murder was not planned, and that he was in his apartment with most of the lights off when A.S. unexpectedly entered through the unlocked front door.  He said that he was using a knife in the kitchen when he heard a bang, but because it was dark, he did not know that it was A.S.  Fearing that an intruder was in the apartment, defendant stated, he made a motion with his knife, accidentally stabbing A.S. in the throat.  Defendant said that when he turned the lights on, he saw A.S. on the floor, struggling like a "fish out of water" until she stopped moving.

Defendant claimed that he "kind of blacked out" at that point, but remembered trying to stop A.S.'s bleeding with towels, cleaning up the blood, and retrieving Sammy's green mattress cover to wrap around A.S.  Defendant claimed he felt remorse but panicked and bound A.S.'s hands and feet with computer wire before placing her outside Sammy's window, intending to move

13

her later.  Detective Raynor confirmed that defendant's account of how he wrapped A.S.'s body was consistent with what the police found.

Raynor then confronted defendant with the fact that A.S.'s pants and underwear were missing.  Defendant maintained that he blacked out and did not remember everything that happened.  Raynor reminded defendant that a witness had seen A.S. and defendant entering the apartment together.  He also told defendant that a lab report confirmed that A.S. had been sexually assaulted, to which defendant responded, "From this point on there's no way for me to lie."

Defendant again stated that he blacked out after stabbing A.S., and that he was "freaked out" and could not remember much except seeing A.S. in the green mattress cover.  Raynor then asked if defendant had sex with A.S. after she died.  Defendant replied, "No.  Not after.  So, if I did, which, I mean, by the way it looks [it's] apparent that I did -- after?  No."  The detectives told defendant that they did not believe his account of blacking out, to which he responded, "The only thing that I know would make me capable of [the sexual assault] is because I've been off my meds for months."  Defendant maintained that his memory was spotty, so the detectives offered him more water and let him smoke another cigarette.

14

The detectives asked defendant for a DNA sample and defendant responded that he would like to talk to his lawyer. The detectives stopped all questioning at that point and arrested defendant for the murder and sexual assault of A.S.

B.

A Monmouth County Grand Jury returned a seven-count indictment, charging defendant with first-degree murder, first-degree felony murder, three counts of first-degree aggravated sexual assault, fourth-degree unlawful possession of a weapon, and fourth-degree possession of a weapon for an unlawful purpose.

After his indictment, defendant moved to suppress the statements he made to the detectives in the first and second interviews. After hearing Raynor's testimony and watching the recording of the second interview, the trial court denied defendant's motion.

First, the trial court found that the statements made during the first interview were not subject to suppression because defendant was not in custody at the time and thus Miranda warnings were not required. In reaching that determination, the judge found that defendant expressed the desire to provide information that would help in the missing persons investigation; he voluntarily agreed to be transported to the police station and there was no

15

evidence that he was restrained while en route; there was no evidence that any discussion took place between defendant and the transporting officer; upon arrival at the police station, defendant, without prompting, took a seat in the secured common area where about five other witnesses, including members of A.S.'s family, were also seated, waiting to be interviewed; while still unrestrained, the detectives escorted defendant to the second-floor interview room that had no video or audio recording equipment; the conversation lasted only about an hour and a half; and the detectives never secured or locked the interview room door, frequently asked defendant if he needed a break, food, or water, and never told him he could not leave. The trial judge also found credible Raynor's testimony that the detectives conducted the questioning for investigative purposes only, as evidenced by the facts that the detectives did not ask about A.S.'s death and defendant did not implicate himself.

Notwithstanding its conclusion that the first interview was noncustodial, the trial court analyzed whether the second, Mirandized interview should be suppressed under O'Neill, which applies only in the context of a two-step interrogation in which officers (1) violate Miranda, warranting suppression, and (2) then seek to redeem themselves by offering the warnings later.

The trial court also found, based on Raynor's credible testimony and the video of the second interview, that the State proved beyond a reasonable doubt

16

that defendant's <u>Miranda</u> waiver was knowing, intelligent, and voluntary, and that his confession should be admitted at trial. In reaching that conclusion, the court examined the totality of the circumstances, and considered that defendant was 18 years of age but had not graduated high school; defendant had been at the station for six hours when he received the warnings; detectives frequently offered defendant breaks and food; Raynor spoke in a "quiet, conversational, almost paternalistic tone"; and the detectives were not physically overbearing toward defendant, as evidenced by his behavior throughout the interview, such as wiping crumbs off the table "as casually as if he were in his own home."

Defendant pled guilty to first-degree murder and first-degree aggravated sexual assault of a victim under the age of thirteen. Defendant was sentenced in accordance with the plea agreement to a term of life imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for murder and to a concurrent prison term of fifty years, also subject to NERA, for aggravated sexual assault. The State dismissed the remaining charges.

C.

Defendant appealed, arguing that his motion to suppress should have been granted by the trial court. The Appellate Division reversed the trial court's decision, finding that defendant's statements from both interviews should have been suppressed. The Appellate Division found that the trial

17

court's judgment was not supported by the evidence and that the delayed Miranda warnings were ineffective because of minimization tactics used by interrogating police officers.

The Appellate Division described the events leading to defendant's first interview as follows:

> [A]n eighteen-year-old boy was taken in the backseat of a marked police vehicle to a stationhouse, with no apparent means of returning home or even being told he could leave to go home or elsewhere, and was placed in an area where he was not allowed to move about freely, including getting up and leaving if he chose to do so because anyone seeking to move about had to be escorted.

Concluding that the first interview was custodial, the court stated that defendant was taken from the common space "further into the recesses of the stationhouse, on the second floor," and could not take breaks without an escort. The Appellate Division concluded that "no reasonable person would have thought at any time they were free to leave. Rather, it was clear that [defendant's] liberty was restrained."

As to the second interview, the court held that the detectives minimized the significance of the Miranda warnings by telling defendant that they were providing the warnings only because they were in a police station. The court found that the detectives' comments were especially problematic given defendant's age, education, minimal experience with the criminal justice

18

system, purported mental health issues, and the many hours he spent at the station. The Appellate Division also determined that the detectives had impermissibly implied that defendant's statement was being videotaped for his benefit and suggested that defendant was not being judged and that it was their job to help him through this situation.

In finding that the Miranda warnings were minimized, the Appellate Division relied heavily on the fact that the detectives did not disclose the seriousness of the offense about which defendant was being questioned. Because "the detectives' knowledge established probable cause," the court reasoned, there was a "need to inform defendant of his true status." According to the court, the detectives knew defendant was the prime suspect at least before the second interview, if not before the first. The Appellate Division found that failing to tell defendant about A.S.'s death was "designed or reasonably likely to convey to defendant that he was facing a significantly less serious [situation] than he actually faced." (alteration in original).

Additionally, citing O'Neill, the Appellate Division found that inconsistencies between defendant's first and second interviews were used to obtain his confession, requiring suppression of defendant's statements from the second interview. The court thus concluded that the State failed to prove beyond a reasonable doubt that defendant's waiver was knowing, intelligent,

19

and voluntary.  Accordingly, the judges reversed the trial court's denial of defendant's suppression motion and remanded so that defendant would have an opportunity to withdraw his guilty plea.

The State petitioned this Court for certification on two issues:  whether defendant's first interview was a custodial interrogation; and whether defendant knowingly, voluntary, and intelligently waived his Miranda rights at the beginning of his second interview considering the totality of the circumstances.  We granted the State's petition.  252 N.J. 154 (2022).  We also granted leave to appear as amici curiae to the Association of Criminal Defense Lawyers of New Jersey (ACDL) and the Innocence Project.

## II.

## A.

The State, relying on State v. S.S., 229 N.J. 360, 365 (2017), argues that the Appellate Division substituted its own factual findings for those of the trial court without first finding clear error, and in doing so violated the principles of limited appellate review of a trial court's ruling on a suppression motion.  The State also challenges the Appellate Division's analysis and conclusion that the detectives minimized the Miranda warnings, arguing that the proper analysis should have considered the totality of the circumstances, rather than focus on

20

discrete comments taken out of context. In sum, the State claims that the detectives were straightforward, informative, and non-coercive.

Finally, the State disagrees with the Appellate Division's finding that defendant was misled into believing that he was giving a witness statement concerning a missing person even though the police knew at that time that it was a homicide case. The State asserts that defendant voluntarily provided a statement regarding his knowledge about A.S.'s disappearance and adds that the Appellate Division failed to take into account that the obligations of the detectives are circumscribed by this Court's opinion in Sims, 250 N.J. at 214.

B.

Defendant urges this Court to affirm the Appellate Division's judgment. Defendant claims specifically that (1) his first interview was in fact a custodial interrogation requiring Miranda warnings and, therefore, suppression of any statements made to the detectives at that time; (2) the second interrogation was a continuation of the first, and that the delayed Miranda warnings were thus ineffective; and (3) even if there was no issue with the timing of the warnings, defendant's waiver of his Miranda rights was not knowing, intelligent, and voluntary.

Defendant does not claim that police must inform an interrogee of his suspect status but contends that the Appellate Division correctly treated the

21

knowledge of his status as a factor in the totality of circumstances analysis for a valid <u>Miranda</u> waiver.

## C.

Amici support defendant's contentions.  The ACDL argues primarily that defendant was denied due process under the Fifth Amendment because, as the ACDL contends, the detectives already considered defendant the main suspect in A.S.'s murder before the first interview but led him to believe that the interviews were about a missing person.  Accordingly, he could not have made a knowing and intelligent waiver of his <u>Miranda</u> rights.  The ACDL also argues that the <u>Miranda</u> warnings are ineffective and require improvement. The Innocence Project, relying on research and data regarding the heightened susceptibility of young people to interrogation tactics like those used by the detectives, asks this Court to clarify the role a suspect's youth should play in the <u>Miranda</u> analysis.

## III.

We begin with the appropriate standard for reviewing evidentiary determinations.  Although a trial court's legal conclusions are reviewed de novo, <u>State v. Gandhi</u>, 201 N.J. 161, 176 (2010), an appellate court must defer to the factual findings of the trial court on a motion to suppress so long as its

findings are supported by sufficient credible evidence in the record, <u>State v. Hubbard</u>, 222 N.J. 249, 262 (2015).

> When more than one reasonable inference can be drawn from the review of a video recording, . . . then the one accepted by a trial court cannot be unreasonable and the alternative inference accepted by an appellate court cannot be superior. In such a scenario, a trial court's factual conclusions reached by drawing permissible inferences cannot be clearly mistaken, and the mere substitution of an appellate court's judgment for that of the trial court's advances no greater good.
>
> [<u>S.S.</u>, 229 N.J. at 380.]

With respect to the trial court's admission of police-obtained statements, as occurred here, an appellate court "should engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." <u>State v. Hreha</u>, 217 N.J. 368, 381-82 (2014) (quoting <u>State v. Pickles</u>, 46 N.J. 542, 577 (1966)). But that review does not generally entail "an independent assessment of the evidence as if [the reviewing court] were the court of first instance." <u>Id.</u> at 382 (alteration in original) (quoting <u>State v. Locurto</u>, 157 N.J. 463, 471 (1999)). Rather, an appellate court's review of the trial court's factual findings is limited to confirming whether there is sufficient credible record evidence to support the trial court's findings of fact. <u>Ibid.</u> An appellate court therefore must not disturb the factual findings made by the trial court even if it might have reached a different

23

conclusion.  <u>Ibid.</u>  Nevertheless, when the trial court's factual findings are "clearly mistaken," "'the interests of justice demand intervention' by an appellate court."  <u>State v. L.H.</u>, 239 N.J. 22, 47 (2019) (quoting <u>S.S.</u>, 229 N.J. at 381).

IV.

We first must determine whether <u>Miranda</u> warnings were necessary prior to the officers' first interview with defendant, which hinges on whether the trial court correctly found that defendant was not in custody at the time of the first interview.

A.

Both the Fifth Amendment to the United States Constitution and our state's common law, codified by statute, safeguard an individual's right against compelled self-incrimination.  <u>U.S. Const.</u> amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . .");  N.J.S.A. 2A:84A-19 (explaining the right of every natural person to "refuse to disclose . . . any matter that will incriminate him");  N.J.R.E. 503 (same).  Accordingly, when police seek to interrogate a suspect while he is in custody, they must provide the familiar <u>Miranda</u> warnings.  <u>See Miranda</u>, 384 U.S. at 492. Without those procedural safeguards, "confessions obtained during custodial interrogations are inadmissible."  <u>Hubbard</u>, 222 N.J. at 265.

24

"Custody" for the purposes of <u>Miranda</u> requires a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted). Under New Jersey's jurisprudence, determining the issue of custody is "fact-sensitive and sometimes not easily discernible." <u>State v. Scott</u>, 171 N.J. 343, 364 (2002). "The relevant inquiry is determined objectively, based on how a reasonable person in the suspect's position would have understood his situation," rather than "on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Hubbard</u>, 222 N.J. at 267 (quotations, citations, and alteration omitted).

"The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action . . . ." <u>State v. P.Z.</u>, 152 N.J. 86, 103 (1997). The court considers factors such as "the time and place of the interrogation, the status of the interrogator, [and] the status of the suspect." <u>Ibid.</u> However, simply because someone is questioned at a police station, by police officers, does not mean they are "in custody." <u>See</u> <u>State v. Marshall</u>, 148 N.J. 89, 225-26 (1997). Nor is it dispositive whether police consider someone a "suspect," "person of interest," or "witness." <u>See, e.g.</u>, <u>State v. Keating</u>, 277 N.J. Super. 141, 148 (App. Div. 1994) ("What the police

25

had in mind . . . is not the issue; the issue is whether defendant reasonably believed that he was in custody when being questioned.").

B.

In concluding that defendant was not in custody when he was first interviewed by the detectives, the trial court relied on facts it found after listening to the testimony of Detective Raynor, which the court found to be credible.  Specifically, the trial court found that (1) defendant rode voluntarily and unrestrained with officers to the police station; (2) defendant expressed the desire to cooperate in the investigation; (3) Detective Raynor believed defendant was merely a witness at the time; (4) upon arrival at the police station, defendant chose a seat in a common area with five other witnesses, including members of A.S.'s family; (5) defendant was never restrained and was shown to the only available interview room, which had no recording equipment; (6) defendant remained in the unlocked room for some time, including the one-and-a-half-hour interview; (7) during the interview, he was not asked about A.S.'s death and did not implicate himself in her murder; (8) the detectives frequently asked if defendant wanted a break, food, or water; and (9) defendant was never told he was not free to leave and walk the short distance to his home.  Those trial court findings -- based upon its first-hand observations and evaluation of Detective Raynor's testimony -- are entitled to

appellate deference, S.S., 229 N.J. at 374 ("In the typical scenario of a hearing with live testimony, appellate courts defer to the trial court's factual findings . . . ."), and we find no reason to second-guess those findings because they are not "clearly mistaken."

There is no evidence that defendant was forced to go to the police station or that he was handcuffed during the drive. Indeed, there is no reason to believe that the short trip was anything but voluntary. Moreover, when defendant arrived at the station, he sat on a bench -- unsupervised and unrestrained -- among other members of the public, including his neighbors from the apartment complex and members of A.S.'s family. In no way was defendant's freedom of action restrained to a "degree associated with" formal arrest. See Beheler, 463 U.S. at 1125.

The trial court did not attach significance to the detectives' escorting defendant to the second-floor interview room, and neither do we. There is no reason to believe defendant would have known where to go unless taken there. Defendant was in an unfamiliar place and was led by people familiar with the premises.

Finally, nothing about the interview suggests that it was custodial. The trial court found -- as a matter of fact, amply supported by the record -- that the interview consisted of defendant providing general biographical

27

information and insisting that he knew nothing about A.S.'s disappearance. Moreover, the trial court found that it was only <u>after</u> the interview, when they learned of Linen's statement that he saw A.S. enter defendant's apartment, that the detectives considered defendant a suspect. There is therefore no basis to upset the trial court's conclusion that the interview was noncustodial. Because defendant was not in custody, he was not owed <u>Miranda</u> warnings and there is no basis to suppress his statements from the first interview. <u>See, e.g.</u>, <u>P.Z.</u>, 152 N.J. at 102 ("The predicate requirements of <u>Miranda</u> are that the defendant must be in custody and the interrogation must be carried out by law enforcement."). We therefore reverse the Appellate Division's contrary holding.

Having agreed with the trial court's finding that defendant was not in custody at the time of his first interview, we need not consider whether the first interview constituted an interrogation, nor must we consider whether the second, Mirandized interview implicated <u>O'Neill</u>.

V.

We next consider whether defendant's <u>Miranda</u> waiver at the beginning of his second interview was knowing, intelligent, and voluntary under the totality of the circumstances. We hold that the waiver was valid.

28

## A.

When a defendant moves to suppress custodial statements made to police, the State bears the burden of proving beyond a reasonable doubt that the defendant's waiver of his <u>Miranda</u> rights was made knowingly, intelligently, and voluntarily given the totality of the circumstances.  <u>See</u> <u>Hreha</u>, 217 N.J. at 382-83.

In the totality of the circumstances inquiry, the court considers all the facts surrounding the interrogation, including "the defendant's age, education and intelligence, advice as to constitutional rights, length of [the] detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved."  <u>State v. Nyhammer</u>, 197 N.J. 383, 402 (2009) (quoting <u>State v. Presha</u>, 163 N.J. 304, 313 (2000)). Courts will also consider a defendant's prior experience (or lack thereof) with the criminal justice system.  <u>L.H.</u>, 239 N.J. at 43.  Those factors are assessed "qualitatively, not quantitatively."  <u>Hreha</u>, 217 N.J. at 384.  The inquiry also considers statements and behaviors by the police which tend to contradict the <u>Miranda</u> warnings, or otherwise render them ineffective.  <u>See, e.g.</u>, <u>L.H.</u>, 239 N.J. at 43-44.

B.

Here, defendant had been with the police since he first left his apartment around 10:50 a.m. He was transferred to the first-floor interview room after the first interview ended at around 1:40 p.m. During that time, defendant was allowed cigarette breaks and to use the restroom.

Before leaving defendant alone in the first-floor interview room, the detectives asked if defendant needed anything; he said he was fine. Defendant then waited in that room until the detectives returned to interview him. The trial court observed that during that time, although defendant appeared "bored" and "listless," he did not seem "agitated or distressed in any way." Defendant also felt comfortable walking about the room; at one point, he opened the door and asked if he could have a cigarette. During that time, defendant was again allowed to smoke and use the restroom. The detectives also asked defendant if he needed anything, thanked him for his patience, and told him that it wouldn't be much longer. As defendant waited, the detectives brought him pizza and water.

We agree with the trial court that although defendant may have been bored, there is nothing to suggest that he was exhausted or mistreated when the second interview began at around 5:25 p.m.

At the start of the second interview the detectives read defendant his Miranda rights. The trial court, after having watched the video of the interrogation, found that Detective Raynor read the form aloud and that defendant affirmed his understanding after hearing each of the rights. The trial court also found that Raynor recorded all of defendant's responses on a form, that defendant reviewed the recorded responses, and that Raynor confirmed that defendant read and understood English. Moreover, Raynor read defendant the following provision: "having these rights in mind, I wish to waive or give up those rights and make a knowing and voluntary statement and answer questions," and explained "that means you are okay with talking with us." Defendant said "yes" and signed the form, acknowledging that he wished to waive his Miranda rights and speak with the detectives.

Defendant was an adult. He could read and write. Other than his brief mention of a purported history of depression, there is nothing in the record to suggest that defendant did not know what Detective Raynor meant when he said:

> You have the right to remain silent and refuse to answer any questions.
>
> . . . .
>
> Anything you say may used against you in a court of law.

31

. . . .

> You have the right to consult with an attorney at any time and have him present before and during questioning.

. . . .

> If you cannot afford to hire an attorney, one will be provided if you so desire prior to any questioning.

. . . .

> A decision to waive these rights is not final, and you may withdraw your waiver whenever you wish, either before or during questioning.

Although defendant had minimal experience with the criminal justice system,[2] the inquiry is the <u>totality</u> of the circumstances. Here, the trial court found that the detectives were accommodating, even "paternalistic" toward defendant, a literate adult whom they allowed to take breaks, smoke, eat, and drink. Furthermore, police fully apprised defendant of his rights, and he asserted his right to counsel when detectives asked for a DNA sample; the detectives stopped all questioning at that point. On those facts -- all adequately supported by the record -- we agree with the trial court: defendant received and understood his <u>Miranda</u> rights.

---

[2] We note, however, that the trial judge did not make a specific finding as to defendant's criminal history. Defendant's brief reveals one prior juvenile adjudication.

Throughout the second interview, the detectives challenged defendant's account of what happened that day. Indeed, they pressed him about inconsistencies with his first statement, but because there was no initial Miranda violation, the second interview was not "tainted" by reference to the first.

We also reject defendant's argument and the Appellate Division's conclusion that police minimized the significance of the Miranda warnings and the consequences of waiving them. Here, Detective Raynor was candid with defendant. Indeed, when defendant falsely told the detectives that "the most I know is that [A.S.] is missing," Detective Raynor told defendant that it was "worse than that," that they knew "this little girl was at [his] apartment," and that A.S. had been found wrapped in something that came from his apartment. Raynor explicitly asked defendant to talk to him "about something that you know is heinous, you know is no good." (emphasis added). He also truthfully told defendant about the evidence against him. That did not render defendant's confession involuntary.

Although Detective Raynor was persistent, persuasive, and frequently appealed to defendant's conscience, he did not undermine Miranda in a way that our cases forbid. Our case law requires more than what occurred here to undermine Miranda. For example, police cannot tell a suspect that giving a

statement will actually benefit them. State in Int. of A.S., 203 N.J. 131, 151 (2010). Nor can police promise the defendant confidentiality, or that his words will not hurt him. State v. O.D.A.-C., 250 N.J. 408, 423 (2022). But Raynor did not promise leniency, nor did he suggest that defendant's words could not hurt him. As the trial judge put it, Raynor merely spoke to defendant in a "quiet, conversational, almost paternalistic tone," and told him that he was not judging him, that "[t]hings happen," and that there was value in having a dialogue about what happened.

Nor does our recent holding in State v. Bullock affect our decision here. 253 N.J. 512 (2023). That case concerned two-step interrogations and what happens when police minimize the significance of the Miranda warnings. As explained above, this was not a two-step interrogation. Moreover, Detective Raynor did not minimize the significance of the Miranda rights; his fleeting comment that he was providing the Miranda rights "because we're in the police station," was immediately reformed when he said, "Because we want to talk to you about this[,] I'm going to advise you of your Miranda rights." (emphasis added). That was an accurate statement of the law -- because defendant was in custody and Raynor wanted to interrogate him, Raynor had to provide the Miranda rights.

Moreover, the circumstances suggest that defendant understood the consequences of giving a statement -- he acknowledged that he was on camera and that other police officers could be watching, and he was concerned only with his mother and girlfriend seeing the interview.

In sum, defendant voluntarily went to the police station to give a witness statement. At the police station, defendant was interviewed twice. During his first interview, defendant was not in custody and thus not yet owed <u>Miranda</u> warnings. And before police interviewed defendant the second time, they properly administered <u>Miranda</u> warnings. With his rights in mind, defendant executed a knowing, intelligent, and voluntary waiver. During his second interview, defendant confessed. Neither the Fifth Amendment nor our common law calls for suppression of defendant's statements.

## VI.

For the reasons set forth above, we reverse the judgment of the Appellate Division and remand to the Appellate Division to consider defendant's contentions about his sentence.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, WAINER APTER, and FASCIALE join in JUSTICE SOLOMON's opinion. JUDGE SABATINO (temporarily assigned) did not participate.

35